## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

CHRISTIAN WILLIAM KIGHT

CRIMINAL CASE NO.

1:18-cr-00169-TWT-RGV

## **MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Defendant Christian William Kight ("Kight") is charged with one count of extortion, in violation of 18 U.S.C. § 1951; one count of computer fraud and abuse, in violation of 18 U.S.C. § 1030(a)(5)(A); one count of computer fraud and abuse, in violation of 18 U.S.C. § 1030(a)(7)(C); one count of extortion by interstate communication, in violation of 18 U.S.C. § 875(d); and five counts of wire fraud, in violation of 18 U.S.C. § 1343. [Doc. 1].[1] Kight has filed a motion to suppress evidence resulting from execution of search warrants,[2] [Doc. 20], which the government opposes, [Doc. 25], and he has filed a reply in support of his motion, [Doc. 27]. Kight also has filed a motion to suppress statements made to law

_____

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] Only one search warrant is the subject of the motion despite its title.

enforcement, [Doc. 21], and following an evidentiary hearing on November 9, 2018,[3] the parties submitted post-hearing briefs on this motion, <u>see</u> [Docs. 35, 40 & 41].  For the reasons that follow, it is **RECOMMENDED** that both motions to suppress, [Docs. 20 & 21], be **DENIED.**

## I.  FACTUAL BACKGROUND

On January 24, 2018, the Federal Bureau of Investigation ("FBI") began investigating an unauthorized intrusion into the computer network of a business (the "victim-company") located in the Northern District of Georgia.  [Doc. 20-2 at 14 ¶ 4, 15 ¶ 6]; <u>see also</u> [Doc. 25-2]; (Tr. at 3).[4]  The victim-company reported to the FBI that sensitive data had been exfiltrated through the unauthorized intrusion into their computer network.  [Doc. 20-2 at 15 ¶ 6].  The investigation revealed that someone using the email address drillo@tuta.io began communicating with the victim-company's CEO on January 23, 2018, about the unauthorized computer intrusion. [<u>Id.</u> at 17-19 ¶¶ 11-17].  Those emails confirmed the intrusion, that the writer had

_____

[3] <u>See</u> [Doc. 33] for a transcript of the evidentiary hearing.  Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)."  In addition, the parties submitted exhibits at the evidentiary hearings, which will be referred to as "(Gov't Ex. ___)" for the government's exhibits and ("Def. Ex. ___") for Kight's exhibits.

[4] The following is a summary of the evidence presented at the evidentiary hearing and facts stated in the affidavit submitted in support of the search warrant, and additional details will be included in the discussion of the specific pending motions.

exfiltrated files belonging to the victim-company, sought an offer of payment in exchange for the return of the stolen data files, and threatened to disseminate the stolen data files as well as send reputation-harming letters to the victim-company's clients. [Id.]. The victim-company tracks internet users through "cookies," which are small data files sent to a user's web browser upon accessing a website, [id. at 15-16 ¶¶ 7-10 (internal marks omitted)], and sells anonymized data, gathered from these cookies, to marketing companies for the purpose of targeting specific types of customers. [Id. at 17 ¶ 10c]. Once sent to the user's computer, the cookie generally remains on the user's computer system until it is deleted, thus tracking and logging the websites later visited by the user. [Id.]. The cookie also logs the IP addresses of the user. [Id. at 22 ¶ 24]. Each cookie is unique, which the victim-company refers to as a "visitor_id." [Id. at 21 ¶ 22 (internal marks omitted)].

The victim-company determined that the intruder had gained access to their computer network through an internal user credential, "desktop-nexus." [Id. at 19-20 ¶ 18]. That login, "desktop-nexus," had significant privileges within the victim-company's computer network, which allowed the intruder to access multiple servers and databases containing sensitive information. [Id.]. Between January 17, 2018, and January 24, 2018, three (3) IP addresses appeared in the victim-company's connection logs for the compromised credential "desktop-nexus." [Id. at 20-21 ¶¶

19-20].  Of those three attacker IP addresses, the victim-company happened to have several unique "visitor_id" cookies linked to two of them; most importantly, to IP address 104.238.45.78.  [Id. at 21-22 ¶¶ 21-23].

One cookie in particular ( the "subject cookie") revealed the user accessing the victim-company's websites from multiple IP addresses, including 104.238.45.78. [Id. at 22-23 ¶¶ 23-24].  IP address 104.238.45.78 resolved to a virtual private network ("VPN"), which is a remote location address sometimes used to obscure the true location of a user.  [Id. at 20-21 ¶ 19, 22-23 ¶¶ 24, 27].  However, the subject cookie that had accessed the victim-company's website from that IP address also accessed the victim-company's website from other IP addresses.  [Id. at 22-23 ¶ 24].  One of those other IP addresses resolved to a residence located at 3150 Inclinado, San Clemente, California ("the residence"), owned by L.K., Kight's mother.  [Id. at 23-25 ¶¶ 27-28, 31c]. Subsequent investigation revealed that Kight and another individual, Tak Cheong ("Cheong"), also resided at the residence with L.K.[5]  [Id. at 24 ¶ 30].

Data provided by the victim-company from the logs of the subject cookie revealed other websites visited by the intruder, in addition to the victim-company sites.  [Id. at 26 ¶ 33]. One of those websites was www.up-4ever.com, which is a file sharing site that allows users to post files online.  [Id. at 26 ¶ 34].  The specific

_____

[5] A fourth individual, unconnected to the investigation, was later discovered to be living at the residence at the time the search warrant was executed.  (Tr. at 8-9).

webpage identified by the subject cookie linked to a posting by a user with the screenname "sourzombie." [Id. at 26 ¶¶ 33-34 (internal marks omitted)]. Additional investigation of the screenname "sourzombie" identified several other websites with users posting under that name. [Id. at 27 ¶ 35]. In one public post, "sourzombie" claimed to be proficient in computer programming and database administration, and listed the age of 26, the same age as Kight at the time of the post. [Id.]. Another website with a post from "sourzombie" offered for sale a gold pen with a photo link. [Id. at 28 ¶¶ 36-37]. Clicking on the link revealed that the publicly listed owner of the photo account is Cheong. [Id. at 28 ¶ 37].

On April 16, 2018, FBI Special Agent Beverly Mayo ("SA Mayo") applied for a search warrant for Kight's residence in California. [Doc. 20-2 at 2-40]. A United States Magistrate Judge for the Central District of California signed the search warrant that day, [Doc. 20-1 at 2], and agents executed the warrant the following day, [id. at 3]. Around 6:00 a.m. on April 17, 2018, an FBI SWAT team approached and entered the residence pursuant to the search warrant and was responsible for clearing the house of occupants and securing the location for execution of the warrant. (Tr. at 5-6, 28). The SWAT team used flash bangs in order to distract and disorient the occupants so that the residence could be secured without incident. (Tr. at 6-7, 35, 38). The four occupants of the house, Kight, his mother, Cheong, and a

boarder, were handcuffed and removed from the residence. (Tr. at 8-9, 13). After the SWAT team secured the scene, they contacted the case agent, FBI Special Agent Tyson Fowler ("SA Fowler"), who was not involved in the initial approach to the residence, but instead waited at a nearby location, and he arrived at the residence at approximately 6:15 to 6:20 a.m. (Tr. at 8-9).

When SA Fowler arrived, the occupants of the residence were sitting on a low wall along the driveway, either without handcuffs or in the process of being uncuffed. (Tr. at 9, 13). Kight was sitting along this wall, wrapped in a blanket and holding his dog. (Tr. at 9-10, 13). The weather was clear and the temperature was approximately in the fifties. (Tr. at 9). SA Fowler introduced himself to Kight and asked if he needed anything, such as a blanket, shoes, or water, but they did not talk about the case at this time. (Tr. at 12-13). SA Fowler observed that Kight was physically okay and lucid. (Tr. at 13). Between approximately 15 to 25 agents entered the residence after it was secured by the SWAT team to begin executing the search warrant. (Tr. at 10).

About an hour after arriving at the scene, SA Fowler began an interview of Kight in the master bathroom of the residence. (Tr. at 12-14, 16, 38-39, 48-49). SA Mayo also was present for the interview, which was recorded and lasted about two

hours.  (Tr. at 14-15, 18-19, 23); <u>see also</u> (Gov't Ex. 3).[6]  Because the search of the residence was underway, the door to the bathroom was closed at some point to accommodate the recording of the interview by minimizing noise from the ongoing search.  (Tr. at 19-20).  SA Fowler testified that the bathroom was larger than most interview rooms he had used at the FBI office.  (Tr. at 18; Gov't Exs. 5, 6, & 7).  Kight sat on a stool in the middle of the bathroom, and SA Fowler and SA Mayo sat on the tiled edge of the tub.  (Tr. at 18-20).  Kight's dog was in the bathroom with him, and Kight was not handcuffed during the interview, nor was his access to the door blocked by the agents.  (Tr. at 18-19).  The interview was later moved to a second location because the search team was ready to search the bathroom.  (Tr. at 21).  The second portion of the interview took place in what SA Fowler described as a craft room.  (Tr. at 21-22; Gov't Exs. 8 & 9).  Again, Kight and the two agents were the only people present for the interview, and the agents were seated in front of the closet door, over by the craft table, and Kight sat in the middle of the room on a stool, and his access to the door was not blocked.  (Tr. at 22; Gov't Ex. 9).[7]  The agents were armed,

---

[6] A transcript of the recorded interview was admitted as an exhibit at the evidentiary hearing.  <u>See</u> (Tr. at 16; Gov't Ex. 4).

[7] The record does not definitively reflect whether the door to the craft room was closed for the interview, but the government acknowledges in its brief that the door to the craft room was closed.  <u>See</u> [Doc. 40 at 5].

but neither unholstered their weapons at any time, nor did they touch Kight in an aggressive manner.[8]   (Tr. at 19).

SA Fowler testified that Kight, who was approximately 27 years old at the time, appeared to be intelligent and was articulate and coherent during the interview, and there were no signs of intoxication.   (Tr. at 13-14).   The agents afforded Kight a bathroom break, as well as one for his dog, and water breaks.   (Tr. at 20-21).   The tone of the interview was conversational and neither agent raised their voice or threatened Kight.   (Tr. at 20; Gov't Ex. 3).   SA Fowler told Kight multiple times during the interview that the interview was voluntary and that he was free to leave.   (Tr. at 20; Gov't Ex. 4 at 5-7, 32, 102, 126).   Kight was on state parole at the time of the interview, and SA Fowler had been in touch with his parole officer to gather information about Kight and to inform the parole officer that the search warrant would be executed at the residence.   (Tr. at 23-24).   Kight's parole officer was at the residence during the search, but he did not participate in the interview of Kight.   (Tr. at 23-24, 65).   Near the beginning of the interview, SA Fowler acknowledged that Kight was on parole and noted that his parole officer was at the residence, but not participating in the interview, and SA Fowler specifically advised Kight:

---

[8] SA Fowler could not recall if he shook Kight's hand.   (Tr. at 19).

[SA] FOWLER: We knew [that you were on parole]. But understanding conditions of your parole is potentially to have to talk to law enforcement or whatever - -

[] KIGHT: Right.

[SA] FOWLER: -- like that, but in this circumstances, we really want you to know that this is voluntary.

[] KIGHT: Right.

[SA] FOWLER: You're free to leave if you want to. Huh?

[] KIGHT: No. No, thank you.

[SA] FOWLER: Okay. You're saying no, you don't want to leave?

[] KIGHT: Right, no. That's what I mean.

[SA] FOWLER: Okay. I have to let you know - -

[] KIGHT: Okay.

[SA] FOWLER: -- that it is voluntary.

[] KIGHT: Okay.

[SA] FOWLER: For you to talk to me right now. Because I - - even though you're on parole.

[] KIGHT: Uh-huh [*affirmative*].

[SA] FOWLER: And I know your parole officer was downstairs.

[] KIGHT: Right.

[SA] FLOWLER: But he's not here in the room with us.

[] KIGHT:  Right.

[SA] FOWLER: Is that  correct?

[] KIGHT:  Yes.

[SA] FOWLER:  Okay. So those conditions aren't necessarily going to be exactly what we're gonna talk about here.

[] KIGHT:  Okay.

[SA] FOWLER:  So kind of - - I want to separate that as best we can. I know that's tricky. So I'm gonna read this to you. It says you are being asked to provide information about a criminal investigation. Obviously we're here for  a criminal investigation.

[] KIGHT:  Okay.

[SA] FOWLER:  A search warrant.  This is a voluntary interview.  Accordingly, you do not have to answer any questions.  It is not a violation of your parole to refuse to answer my questions or to refuse to speak with me.  If you do not wish to answer any questions, your refusal to answer my  questions will not, in and of itself, subject you to any proceedings or adverse actions against you related to your parole.  Any requirement of your parole that would ordinarily require you to cooperate and answer my questions or face penalties does not apply for the purpose of this interview.  Any statements you provide can be used against you in criminal or other proceedings.  You are free to terminate this interview at any time.  Do you understand what I said?

[] KIGHT:  I do.

[SA] FOWLER:  Do you have any questions about that?

[] KIGHT:  I do not.

[SA] FOWLER: Okay. Are we able to talk about what's going on and I can tell you  - -

[] KIGHT:  Yes, please.

(Gov't Ex. 4 at 5-7).

At the conclusion of the interview, SA Fowler again told Kight that he was free to leave and gave him instructions about where he could wait within the residence while the search was concluded if he chose to stay.  (Tr. at 66-68).  At some point after the interview concluded, Kight's parole officer arrested him for parole violations, including possessing pornographic material and drugs at the residence. (Tr. at 26, 66).

## II.   DISCUSSION

### A.   <u>Motion to Suppress Evidence, [Doc. 20]</u>

Kight moves to suppress evidence obtained during the search of his residence, contending that SA Mayo's affidavit, submitted in support of the search warrant, contained material misrepresentations and omissions and did not provide sufficient facts to establish probable cause for issuance of the warrant.  [Doc. 20 at 10]. Specifically, Kight asserts that SA Mayo made a misrepresentation about the subject cookie that connected the IP address used by the intruder of the victim-company to his residence because SA Mayo represented that cookies are static and can only be deleted, when, in fact, cookies can be edited.  [Id. at 15].  Kight argues that "[h]ad the Magistrate Judge known this fact, the search warrant would not have been signed

because probable cause would not have existed to link the hack to [his] house."

[Id.].  The government responds that "no dishonesty or recklessness existed in the

preparation of the warrant affidavit, and the magistrate [judge] had sufficient facts

upon which to find probable cause," and "the agents and officers executed the search

warrant in good faith reliance on the signed warrant in hand."  [Doc. 25 at 15].

　　　1.　　*Franks* **Challenge**

"A challenge to a search warrant on the grounds of falsity or reckless

statements in the supporting affidavit is handled pursuant to Franks v. Delaware,

438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)."  United States v. Lebowitz, 647 F.

Supp. 2d 1336, 1345 (N.D. Ga. 2009), adopted at 1342, aff'd, 676 F.3d 1000 (11th Cir.

2012) (per curiam).  "Under *Franks*, if an affidavit submitted to a judicial officer in

support of a request for a search warrant contains 'a false statement [made]

knowingly and intentionally, or with reckless disregard for the truth,' and if,

stripped of that false statement, the affidavit does not establish probable cause, 'the

search warrant must be voided. . . .'"  O'Ferrell v. United States, 253 F.3d 1257, 1267

(11th Cir. 2001) (alterations in original) (quoting Franks, 438 U.S. at 155–56).  Thus,

to prevail on a Franks challenge, a defendant "must establish (1) that information

contained in an affidavit was untrue, (2) that inclusion of the untrue information

was either deliberate or in 'reckless disregard for the truth,' and (3) that the untrue

information was an essential element of the probable cause showing relied upon by the judicial officer in issuing the search warrant." Id.

A defendant who brings a Franks motion must make "'a substantial preliminary showing that an affiant knowingly and intentionally included a false statement in an affidavit, or made the false statement with reckless disregard for its truth,'" and "'the false statement was necessary to the finding of probable cause.'" United States v. Maharaj, No. 07-80024-CR-CR, 2007 WL 2254559, at *6 (S.D. Fla. Aug 2, 2007), adopted at *1 (quoting Franks, 438 U.S. at 156). "'The *Franks* standard is a high one.'" United States v. Nakouzi, No. 3:05CR154(MRK), 2005 WL 3211208, at *5 (D. Conn. Nov. 30, 2005) (quoting Rivera v. United States, 928 F.2d 592, 604 (2d Cir. 1991)). Thus, "'[t]o mandate an evidentiary hearing, the challenger's attack [on the affidavit] must be more than conclusory and must be supported by more than a mere desire to cross-examine.'" Id. (alterations in original) (quoting Franks, 438 U.S. at 171).

Negligent or innocent mistakes in a warrant application do not violate a defendant's Fourth Amendment rights. See Franks, 438 U.S. at 171; Maughon v. Bibb Cty., 160 F.3d 658, 660 (11th Cir. 1998) (per curiam); Madiwale v. Savaiko, 117 F.3d 1321, 1326-27 (11th Cir. 1997). Moreover, "'[i]nsignificant and immaterial misrepresentation[s] or omissions will not invalidate a warrant.'" Maharaj, 2007 WL

2254559, at *7 (quoting United States v. Ofshe, 817 F.2d 1508, 1513 (11th Cir. 1987)).

Not every fact recited in an affidavit in support of an application for a search warrant must be exactly correct, but the affidavit must be truthful in the sense that it is believed or appropriately accepted by the affiant as true.  See Franks, 438 U.S. at 165 (explaining that "probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily").  Furthermore, "only in rare instances is a *Franks* hearing merited when facts have been omitted in a warrant application" because "[a]llowing omissions to be challenged would create a situation where almost every affidavit of an officer would be questioned."  United States v. Lievertz, 247 F. Supp. 2d 1052, 1058 (S.D. Ind. 2002) (quoting Mays v. City of Dayton, 134 F.3d 809, 815 (6th Cir. 1998)).

The defendant also bears the burden of showing that, absent the alleged misrepresentations or omissions, probable cause would have been lacking.  See Maharaj, 2007 WL 2254559, at *6 (citing United States v. Novaton, 271 F.3d 968, 987 (11th Cir. 2001)).  Upon such proof by the defendant, the Court must suppress the items seized pursuant to the defective search warrant.  See United States v. Weber, 808 F.2d 1422, 1424 (11th Cir. 1987) (per curiam); United States v. Kirk, 781 F.2d 1498, 1502 (11th Cir. 1986).  However, "if the court is satisfied that when material that is

14

the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, then no hearing is required." Nakouzi, 2005 WL 3211208, at *5 (internal citation and marks omitted).

Kight has not made a sufficient showing to merit an evidentiary hearing under Franks. First, Kight has failed to demonstrate that SA Mayo made any statements in the affidavit that were "knowingly and intentionally" false or made "with reckless disregard for [their] truth." Franks, 438 U.S. at 156. Indeed, as the government correctly points out, Kight "fails to identify a specific statement in the affidavit that is alleged to be false." [Doc. 25 at 19]. Kight asserts that "[t]he key misrepresentation is that cookies are not as static, as the affidavit led the magistrate court to believe." [Doc. 20 at 14]. However, he has not identified where SA Mayo made such a statement in her affidavit, see generally [Doc. 20], and in his reply, Kight concedes that "although not stated in the affidavit" the "logical connection" from SA Mayo's statements that the victim-company used cookies to track internet users and "[c]ookies generally remain on a computer system until they are deleted and are stored on the computer's web browser," is that "the victim-company is able to track an internet user through a static cookie," [Doc. 27 at 3]. Kight's contention is unpersuasive because, although SA Mayo did state that cookies "are unique and

have values that correspond to the company that created them," [Doc. 20-2 at 15 ¶ 10b], she did not describe cookies as static, and even provided an example of a circumstance in which a new unique cookie might be assigned to a user, [id. at 22 ¶ 23].  Thus, he has not shown that SA Mayo made any false statement regarding cookies being static, much less that she did so knowingly or in reckless disregard of the truth.

At best, Kight perhaps could argue that SA Mayo omitted information that a cookie can be edited, but he has not shown that such an omission was made intentionally or with reckless disregard for the truth in order to mislead the magistrate judge, and even if he could make that showing, he has not demonstrated that the omission was material to the determination of probable cause.  See United States v. Sarras, 575 F.3d 1191, 1219 (11th Cir. 2009) (finding an omission of fact did "not affect the finding of probable cause").  Including a statement in the affidavit that cookies are generally capable of being altered does not affect the evidence set forth in the search warrant affidavit regarding the subject cookie that was identified from IP addresses used to infiltrate the victim-company's computer network through a compromised login, and thereafter, other IP addresses associated with the subject cookie led to Kight's residence.  See [Doc. 20-2].  Moreover, the subject cookie also provided investigators with other websites visited by the user, which linked to Kight

and another occupant of the residence, Cheong.  [Id. at 26-28 ¶¶ 33-37].  Thus, even if the affidavit had included the statement that cookies can be altered, there has been no showing that the subject cookie was altered in any way that would diminish the probable cause connecting the computer intrusion to an IP address at Kight's residence.

Kight also asserts that SA Mayo made misrepresentations to the magistrate judge about the username "sourzombie" as someone who represented themselves to be knowledgeable in computers and had uploaded "compilations of usernames and passwords tied to accounts at Panera Bread Company, Barnes & Nobles, and Express Clothing store." [Doc. 20 at 15 (citation and internal marks omitted)].  Kight does not explain the basis for his contention that these are materially false statements, and he has made no showing, much less a substantial one, that the alleged false statements were knowingly made or in reckless disregard for the truth.  Moreover, as the government contends, "the deletion of the information about the contents of the uploaded file by 'sourzombie' does nothing to defeat a finding of probable cause," because "[t]he contents of the uploads are not what link 'sourzombie' to these crimes; it is the fact that the subject cookie is linked to 'sourzombie'—an online moniker linked to [Kight]—that ultimately links [him] to these crimes." [Doc. 25 at 22-23].  Accordingly, Kight's contention about the "sourzombie" statements is without merit.

## 2. *Probable Cause*

Independent of his <u>Franks</u> argument, Kight asserts that "the search warrant and its execution are unlawful because it failed to provide the issuing magistrate [judge] with probable cause for the search." [Doc. 20 at 12]. In particular he argues that SA Mayo's "affidavit failed to allege facts giving the magistrate [judge] with probable cause that contraband would be located at the house." [<u>Id.</u>]. The government responds that "the affidavit provided facts and circumstances sufficient to find probable cause connecting [Kight] to the crimes, the location to be searched, and the objects to be seized." [Doc. 25 at 12]. In addition, the government asserts that the agents relied in good faith on the validity of the warrant issued by the magistrate judge in conducting the search of Kight's residence. [<u>Id.</u> at 14-15].

The Eleventh Circuit has explained the Court's review of the sufficiency of a search warrant as follows:

> When called upon by law enforcement officials to determine the legitimacy of search warrants and their supporting affidavits, issuing magistrates and reviewing courts alike must strike a delicate balance between constitutional guarantees against excessive intrusions into areas of individual freedom and the Government's need to access and to secure relevant evidence in criminal prosecutions. In particular, issuing magistrates are given the unenviable task of making "firing line" decisions that attempt to encourage availment of the warrant process while simultaneously striving to protect citizens from unwarranted governmental interference. In recognition of the difficulty inherent in discharging this responsibility, reviewing courts lend substantial deference to an issuing magistrate's probable cause determinations.

18

United States v. Miller, 24 F.3d 1357, 1363 (11th Cir. 1994).  "The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which the warrant is requested."  United States v. Betancourt, 734 F.2d 750, 754 (11th Cir. 1984) (citing Zurcher v. The Stanford Daily, 436 U.S. 547, 558 (1978)); see also United States v. Cadet, Criminal Action Nos. 1:11-CR-00522-WBH-LTW, 1:11-CR-00113-WBH-LTW, 2013 WL 504892, at *4 (N.D. Ga. Jan. 16, 2013), adopted by 2013 WL 504815, at *1 (N.D. Ga. Feb. 8, 2013), aff'd, 574 F. App'x 917 (11th Cir. 2014) (per curiam) (unpublished) (citation omitted).  That is, "[p]robable cause to search a residence requires some nexus between the premises and the alleged crime."  United States v. Joseph, 709 F.3d 1082, 1100 (11th Cir. 2013) (citation and internal marks omitted). "Probable cause deals 'with probabilities [which are]  . . . the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  Illinois v. Gates, 462 U.S. 213, 241 (1983) (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)); see also United States v. Spann, No. 15–20070, 2015 WL 1969111, at *3 (S.D. Fla. May 1, 2015), aff'd, 649 F. App'x 714 (11th Cir. 2016) (per curiam) (unpublished) (citation omitted).

"Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner."  Miller, 24 F.3d at 1361 (citation

omitted).  Instead, "a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." Id. (citations omitted); see also United States v. McCullough, Criminal Indictment No. 1:11–CR–136–JEC/AJB–01, 2012 WL 11799871, at *13 (N.D. Ga. Oct. 9, 2012), adopted by 2014 WL 3955556, at *2 (N.D. Ga. Aug. 13, 2014) (citations omitted).  Furthermore, "[t]he fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause."  United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985) (citations omitted); see also Adams v. Williams, 407 U.S. 143, 149 (1972) (citation omitted).

Kight's only contention regarding the lack of probable cause for the search warrant for his residence is that the affidavit failed to allege facts showing "probable cause that contraband would be located at the house."  See [Doc. 20 at 10-12].  His argument is without merit because the affidavit provided sufficient facts to establish a nexus between the crimes under investigation and the residence.  See [Doc. 20-2]. Specifically, SA Mayo's affidavit explained that between January 17, 2018, and January 24, 2018, three IP addresses appear in the victim-company's connection logs for the compromised credential "desktop-nexus."  [Id. at 20-21 ¶¶ 19-20].  Of those three IP addresses, the victim-company had several unique "visitor_id" cookies

linked to two of them, including IP address 104.238.45.78, [id. at 21-22 ¶¶ 21-23], that resolved to a VPN, and the subject cookie, which accessed the victim-company's website from that IP address, had also accessed the victim-company's website from other IP addresses, [id. at 22-23 ¶ 24], and one of those other IP addresses resolved to Kight's residence, [id. at 23-24 ¶¶ 27-28]. Thus, the affidavit provided facts that established probable cause to believe that Kight's residence was connected to the computer intrusion at the victim-company. Moreover, SA Mayo supplied adequate reasons for believing that evidence of the crimes under investigation would be found at the residence based on her training and experience regarding digital devices such as those used to infiltrate the victim-company and to communicate with the victim-company's CEO because the facts established probable cause to believe that the intruder used a computer accessing the internet from that residence to access "the victim-company's computer networks as part of the attack and subsequent threats sent to the CEO." [Id. at 24 ¶ 29, 28-37 ¶¶ 38-39]. When considered in its totality, the affidavit set forth facts sufficient to show a fair probability that evidence of the offenses under investigation would be found at Kight's residence on digital devices connecting to the internet from that residence. See United States v. Rhame, CRIMINAL ACTION NO.. 1:16-CR-00067-SCJ-CMS, 2016 WL 11164144, at *9 (N.D. Ga. Dec. 6, 2016), adopted by 2018 WL 1082327, at *22

(N.D. Ga. Feb. 28, 2018) (citation omitted) (finding the affidavit "stated sufficient facts to justify a conclusion that there was a fair probability that evidence of these crimes would be found in the [] Defendants' emails"); United States v. Harvey, CRIMINAL ACTION NO. 1:15-cr-00053-TWT-RGV-1, 2015 WL 9685908, at *18 (N.D. Ga. Nov. 30, 2015), adopted by 2016 WL 109984, at *1 (N.D. Ga. Jan. 8, 2016) (citation omitted) ("The totality of the facts set forth in [the] . . . affidavit sufficiently support a person of reasonable caution in believing that evidence of a crime would be found on computers, cell phones, and other electronic storage devices at [defendant's] residence, and that is all that is required for probable cause.").

### 3.   *Good Faith Exception*

Alternatively, the government argues that, even if the search warrant in this case were found to be invalid, suppression of the evidence seized from the residence would not be required because the law enforcement agents who executed the warrant reasonably relied in good faith on its validity.  [Doc. 25 at 14-15].  Under United States v. Leon, 468 U.S. 897, 919-21 (1984), "the exclusionary rule should not be applied to exclude evidence seized pursuant to a defective search warrant if the officers conducting the search acted in 'objectively reasonable reliance' on the warrant and the warrant was issued by a detached and neutral magistrate."  United States v. Sharp, Civil Action File No. 1:14–cr–229–TCB, 2015 WL 4641537, at *14 n.18

(N.D. Ga. Aug. 4, 2015), adopted at *5 (citations and internal marks omitted); see also

United States v. Robinson, 336 F.3d 1293, 1295-96 (11th Cir. 2003) (citation omitted).

There are four situations in which the Leon good-faith exception does not

apply and suppression is warranted:

> (1) where the magistrate or judge in issuing a warrant was misled by
> information in an affidavit that the affiant knew was false or would
> have known was false except for his reckless disregard of the truth; (2)
> where the issuing magistrate wholly abandoned his judicial role in the
> manner condemned in Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 99
> S.Ct. 2319, 60 L.Ed.2d 920 (1979); (3) where the affidavit supporting the
> warrant is so lacking in indicia of probable cause as to render official
> belief in its existence entirely unreasonable; and (4) where, depending
> upon the circumstances of the particular case, a warrant is so facially
> deficient-i.e., in failing to particularize the place to be searched or the
> things to be seized-that the executing officers cannot reasonably
> presume it to be valid.

United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002) (citation and internal

marks omitted).  The only argument Kight offers against application of the good

faith exception is his contention that SA Mayo intentionally misled the magistrate

judge about the nature of the cookies.  [Doc. 27 at 4-6].  While he is correct that

inclusion of false information in an affidavit knowingly or in reckless disregard of

the truth precludes application of the good faith exception, see United States v.

Harris, 172 F. App'x 950, 960 (11th Cir. 2006) (per curiam) (unpublished), Kight has

not shown that SA Mayo either knowingly or in reckless disregard of truth included

false information in the affidavit about the nature of cookies, as previously discussed with respect to his <u>Franks</u> claim, <u>see</u> <u>Lebowitz</u>, 647 F. Supp. 2d at 1346.

In addition, none of the other situations precluding the good faith exception apply as there is nothing in the record that even hints that the magistrate judge who reviewed the affidavit and signed the search warrant engaged in any misconduct or abrogation of judicial responsibility, and as already discussed, the affidavit set forth sufficient probable cause, and in any event is not "so lacking . . . as to render official belief in its existence entirely unreasonable." <u>Martin</u>, 297 F.3d at 1313 (citation omitted). Moreover, the warrant is facially valid in that it describes in sufficient detail the things to be seized, the location for the search, and it is signed by a magistrate judge. <u>See</u> <u>United States v. Travers</u>, 233 F.3d 1327, 1330 (11th Cir. 2000) (citation omitted) (finding warrant "was not 'so facially deficient—*i.e.*, failing to particularize the place to be searched or the things to be seized—that the executing officers could not have reasonably presumed it to be valid'"). Accordingly, the agents executing the warrant were justified in believing in its validity, and evidence seized during the execution would not be subject to suppression under the good faith exception even if the warrant were found to lack probable cause. <u>Massachusetts v. Sheppard</u>, 468 U.S. 981, 988-89 (1984). Accordingly, for all of the

foregoing reasons, it is **RECOMMENDED** that Kight's motion to suppress evidence resulting from execution of search warrants, [Doc. 20], be **DENIED**.

## B.   Motion to Suppress Statements, [Doc. 21]

Kight moves to suppress the statements he made to law enforcement during the interview conducted at his residence when the search warrant was executed on April 17, 2018.  [Doc. 21].  He contends that his statements should be suppressed "because he was not advised of his *Miranda*[9] rights during a custodial interrogation and his statements were not voluntary." [Doc. 35 at 1 (footnote added) (citation omitted)].   In particular, he asserts that he was interrogated in a setting so dominated by law enforcement officers that he found himself in custody within his own home, [id. at 10-25], and his statements were involuntary due to SA Fowler's alleged coercion and threats associated with the conditions of Kight's parole, [id. at 25-31].  The government responds that Kight "was not in custody at the time of his interview, and the facts and circumstances of the interview show the voluntary nature of [his] participation."  [Doc. 40 at 10].

### 1.   *Miranda Violation Claim*

The ruling in Miranda requires law enforcement officers to apprise a defendant in custody of his Fifth Amendment rights before engaging in

---

[9] See Miranda v. Arizona, 384 U.S. 436 (1966).

interrogation.  See Garcia v. Singletary, 13 F.3d 1487, 1489 (11th Cir. 1994).

Interrogation for Miranda purposes "means 'any words or actions on the part of the

police (other than those normally attendant to arrest and custody) that the police

should know are reasonably likely to elicit an incriminating response from the

suspect.'"  United States v. Gomez, 927 F.2d 1530, 1538 (11th Cir. 1991) (alteration

in original) (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)).  "Statements

made in violation of *Miranda* are not admissible at trial."  United States v. Barry, 479

F. App'x 297, 299 (11th Cir. 2012) (per curiam) (unpublished) (citation omitted).

The questioning of Kight during the interview on April 17, 2018, constituted

interrogation, but the parties dispute whether he was in custody for Miranda

purposes at the time of the interview.  See [Doc. 35 at 9-25; Doc. 40 at 10-17].  A

defendant is in custody under Miranda when there has been a "'formal arrest or

restraint on freedom of movement of the degree associated with a formal arrest.'"[10]

---

[10] Kight argues that he was in custody for purposes of Miranda because a
reasonable person in his situation would not have felt free to leave, see [Doc. 35 at
18-19], but the "Supreme Court [has] clarified 'that the freedom-of-movement test
identifies only a necessary and not a sufficient condition for *Miranda* custody,'"
United States v. Parker, Criminal Case No. 1:10-CR-0176-JEC-JFK, 2010 WL 5313758,
at *8 (N.D. Ga. Nov. 18, 2010), adopted by 2010 WL 5313449, at *1 (N.D. Ga. Dec. 17,
2010) (quoting Maryland v. Shatzer, 559 U.S. 98, 112 (2010)).  In other words, "'a
free-to-leave inquiry reveals *only* whether the person in question was seized.'  While
'seizure is a necessary prerequisite to *Miranda*, . . . a court must [also] ask whether
. . . a reasonable person would have understood his freedom of action to have been
curtailed *to a degree associated with formal arrest.*'"  United States v. Luna-Encinas, 603
F.3d 876, 881 (11th Cir. 2010) (alterations in original) (citations omitted).  Thus, "the

United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006) (citation omitted) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)).   However, "[a]n interviewee's 'status as a suspect, and the coercive environment that exists in virtually every interview by a police officer of a crime suspect,' does not automatically create a custodial situation." United States v. Matcovich, 522 F. App'x 850, 851 (11th Cir. 2013) (per curiam) (unpublished) (quoting United States v. Muegge, 225 F.3d 1267, 1270 (11th Cir. 2000) (per curiam)); see also United States v. Phillips, 812 F.2d 1355, 1360 (11th Cir. 1987) (per curiam) (citation omitted) (quoting Minnesota v. Murphy, 465 U.S. 420, 431 (1984)) ("'[T]he mere fact that an investigation has focused on a suspect does not trigger the need for *Miranda* warnings in noncustodial settings[.]'").   Instead, whether a suspect is in custody "depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." Barry, 479 F. App'x at 299 (quoting Brown, 441 F.3d at 1347).   This test is objective, and "the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are

_____

standards are different," and a person is in custody for Miranda purposes only where there is a "restraint on freedom of movement to the degree associated with a formal arrest." United States v. Street, 472 F.3d 1298, 1310 (11th Cir. 2006) (citations and internal marks omitted); see also United States v. Cavazos, 668 F.3d 190, 193 (5th Cir. 2012) (citations omitted) ("Custody for *Miranda* purposes requires a greater restraint on freedom than seizure under the Fourth Amendment.").

irrelevant." Brown, 441 F.3d at 1347 (citation and internal marks omitted).  Thus, "[t]he 'initial step' in determining whether a person was in 'custody' under *Miranda* 'is to ascertain whether, in light of the objective circumstances of the interrogation' and the totality of all the circumstances, 'a reasonable person would have felt that he . . . was not at liberty to terminate the interrogation and leave.'" Matcovich, 522 F. App'x at 851 (quoting Howes v. Fields, 565 U.S. 499, 509 (2012)).  "[T]he reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." Street, 472 F.3d at 1309 (internal marks omitted) (quoting United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996)).

The Court must "consider several factors in determining custody, 'including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.'" Barry, 479 F. App'x at 299 (quoting Street, 472 F.3d at 1309).  Another relevant factor is the location of the questioning.  In particular, "[a]lthough not dispositive, 'courts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home.'" Matcovich, 522 F. App'x at 851 (quoting Brown, 441 F.3d at 1348)).  Courts should also consider whether a suspect was "unambiguously advis[ed] . . . that he is free to leave and is not in custody." Id. (alterations in original) (citation and internal marks omitted).

"This is a 'powerful factor' that 'generally will lead to the conclusion that the defendant is *not* in custody absent a finding of restraints that are so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.'"   Id. (citation omitted).   Other factors include "the duration of the questioning, statements made during the interview, the presence of physical restraints during questioning, and 'the release of the interviewee at the end of the questioning[.]'"   Id. (quoting Howes, 565 U.S. at 509).

Applying these factors to the instant case, the Court finds that Kight was not in custody for purposes of Miranda during the interview of April 17, 2018.   After the SWAT team cleared the residence and assembled the occupants along the short wall beside the driveway, their handcuffs were already removed or were being removed when SA Fowler arrived at the residence.   (Tr. at 8-9, 13).   Before interviewing Kight, SA Fowler made sure he was comfortable and did not need anything such as a blanket, shoes, food, or water.   (Tr. at 13; Gov't Ex. 4 at 3).   The agents conducted the interview inside the residence in the master bathroom, which was a room larger than most interview rooms SA Fowler had used at the FBI office.   (Tr. at 12-14, 16, 18, 38-39, 48-49).   Only two agents were present in the bathroom with Kight and his dog, and they did not block his access to the door of the room, even though the door was closed at times to accommodate recording of the interview while the search

warrant was being executed in other parts of the residence.  (Tr. at 18-20).  The interview was relocated to another room, which SA Fowler described as a craft room, when other agents were ready to search the bathroom.  (Tr. at 12, 21).  The record does not reflect whether the door to the craft room was closed for the interview, but Kight's access to the door was not blocked by the agents, who were seated by the closet, while Kight sat on a stool in the middle of the room.  (Tr. at 22).  Although the agents had firearms, they were holstered during the interview, and neither agent touched Kight other than possibly to shake his hand.  (Tr. at 19); see also United States v. Blocker, CRIMINAL ACTION NO. 1:14-cr-228-AT/AJB, 2016 WL 3281018, at *17 (N.D. Ga. Feb. 29, 2016) (citations omitted), adopted by 2016 WL 3259096, at *2 (N.D. Ga. June 14, 2016).

The recording of the interview demonstrates that the agents spoke in a calm tone of voice, no promises or threats were made, and the interview was brief, lasting only approximately two hours in total.  (Tr. at 17-21, 35; Gov't Ex. 3); see also United States v. McDowell, 250 F.3d 1354, 1363 (11th Cir. 2001) (finding suspect not in custody when questioned for four hours; Muegge, 225 F.3d at 1269, 1271 (finding suspect not in custody where interview lasted about two and a half hours). Moreover, SA Fowler expressly advised Kight several times during the course of the interview that the interview was voluntary and he was free to leave.  (Tr. at 20; Gov't

Ex. 4 at 5-7, 32, 102, 126).  The agents allowed Kight and his dog to take bathroom breaks and to have water to drink.  (Tr. at 20-21).

Kight argues that even though the interview took place in his residence, it was such a police-dominated atmosphere that he reasonably believed that he was in custody during the interview, but the fact remains that he "was interviewed in familiar surroundings," United States v. Rogers, Criminal Action No. 1:09–CR–544–TWT–ECS, 2010 WL 2721883, at *2 (N.D. Ga. June 9, 2010), adopted by 2010 WL 2697084, at *1 (N.D. Ga. Jul. 7, 2010) (holding interview during execution of search warrant was not custodial where defendant was questioned in his driveway and was prohibited from re-entering his home until the search was complete), which strongly militates against a finding that the interrogation was custodial, see Matcovich, 522 F. App'x at 851 (citation omitted).  Furthermore, the evidence shows that Kight was advised several times during the interview that it was voluntary and he was free to leave, and "[t]his advice has been held to be a 'powerful factor' that 'generally will lead to the conclusion that the defendant [wa]s not in custody,'" Blocker, 2016 WL 3281018, at *17 (last alteration in original) (citation omitted).  The Court is not persuaded that the circumstances of Kight's interview–where he was seated comfortably in rooms within his own home, free from physical restraints, and where the agents spoke to him in a calm tone of voice

with their weapons holstered and allowed him to drink water and have bathroom breaks–"present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." United States v. Peck, 17 F. Supp. 3d 1345, 1359 (N.D. Ga. 2014), adopted at 1348 (citation omitted). Nor does the fact that Kight was temporarily detained following the initial entry of the SWAT team, which used flash bangs, to secure the residence prior to execution of the search warrant suffice to convert the interview into a full-blown custodial interrogation. See Luna-Encinas, 603 F.3d at 882 (citations omitted) (finding even though defendant was detained for a brief period in a neutral, outdoor location while other officers searched the residence, he was "not in 'custody'" for purposes of Miranda, even if he was "'seized' as he sat on the ground in the front yard of his home" because "a reasonable person in his position would not have 'understood his freedom of action to have been curtailed to a degree associated with formal arrest'"). Moreover, during the interview, "[t]here certainly was no restraint on [Kight's] freedom of movement of a degree associated with formal arrest," Rogers, 2010 WL 2721883, at *2, which is required to establish custody under Miranda, see Brown, 441 F.3d at 1347 (citations omitted).[11]

---

[11] In his post-hearing brief in support of his motion to suppress, Kight relies extensively on United States v. Craighead, 539 F.3d 1073 (9th Cir. 2008), to support his assertion that he was in custody in his own home. [Doc. 35 at 11-25]. In Craighead, "the court found the defendant was in custody when he was questioned

while in an unfinished storage room with a law enforcement officer blocking the door, and defendant's supervisor, who was brought to the defendant's home by law enforcement for his 'emotional support,' was not allowed to attend the questioning, contributing to the court's conclusion that a reasonable person in [defendant's] position would feel cut off from the outside world." Peck, 17 F. Supp. 3d at 1365–66 (citing Craighead, 539 F.3d at 1086-87). The undersigned, however, does not find "*Craighead* instructive or compelling a different result." United States v. Asher, Criminal Indictment No. 1:09-CR-414-JOF/AJB, 2010 WL 4192883, at *12 (N.D. Ga. Feb. 25, 2010), adopted by 2010 WL 4237579, at *7 (N.D. Ga. Oct. 21, 2010). "First, this Court is not bound by that decision, since it is not a decision of the Eleventh Circuit." Id. (citations omitted). Moreover, the circumstances in Craighead "are clearly distinguishable from the present case in significant respects." Id. Neither agent present during the interview "unholstered their weapons in the present case." Id. at *13. And, "the fact that Craighead was in the military, lived in base housing and the search team was accompanied by one who was a superior officer, is completely different from this case, where [Kight] lived in his private home with his family and was not effected by the military chain of command." Id. Kight was advised multiple times that the interview was voluntary and that he was free to leave. (Tr. at 20; Gov't Ex. 4 at 5-7, 32, 102, 126); see also Asher, 2010 WL 4192883, at *15 (noting that defendant was repeatedly "advised he was not under arrest before the questioning began."). While the door to the room where Kight was interviewed was closed at times in this case, "[u]nlike Craighead, the [bathroom and craft room doors] . . . [were] not blocked by an agent[.]" Peck, 17 F. Supp. 3d at 1360. "The Court recognizes the Supreme Court's suggestion that isolation from one's family may contribute to a coercive atmosphere by preventing family members, friends, and others who may be sympathetic from providing either advice or emotional support, and without any such assistance, the person who is questioned may feel overwhelming pressure to speak and to refrain from asking that the interview be terminated." Id. at 1361 (citing Howes, 565 U.S. at 511). "However, [Kight] did not establish that his going [to the interview locations in the bathroom and craft room] was coerced," id., and as the government correctly contends, "there is no evidence that [Kight] requested the presence of anyone else during his interview, nor that he was isolated from such support if he had requested it," and his dog was allowed to remain "in his lap or in the room for much of the interview," [Doc. 40 at 15 (citation omitted)]; see also (Tr. at 10, 20-21, 49). Thus, Kight's reliance on Craighead is misplaced. See United States v. Young, CRIMINAL CASE NO. 3:16-cr-00006-TCB-RGV, 2017 WL 653556, at *3 n.11 (N.D. Ga. Jan. 25, 2017), adopted by

In sum, because Kight was not subject to custodial interrogation when the agents spoke with him in his home on April 17, 2018, <u>Miranda</u> warnings were not required.  The statements were not obtained in violation of <u>Miranda</u>, and they are not due to be suppressed on that basis.  <u>See</u> <u>Matcovich</u>, 522 F. App'x at 852 (finding interview during execution of search warrant in defendant's residence was non-custodial where entry by law enforcement created a "'police-dominated atmosphere' with a number of officers handcuffing residents and bringing them to a central location," but where, "'shortly thereafter, the search warrant was announced, the handcuffs were removed,'" and the defendant was told that he was not under arrest); <u>see also</u> <u>United States v. Newton</u>, 181 F. Supp. 2d 157, 174-75 (E.D.N.Y. 2002), <u>aff'd</u>, 369 F.3d 659 (2d Cir. 2004) (finding defendant was not in custody, despite the fact that he was in handcuffs, "because the questioning was not conducted in a setting in which there were the kinds of coercive pressures that would have undermined his will to resist and compelled him to speak" as he "was at home" and was told "he was not under arrest").

---

2017 WL 635120, at *1 (N.D. Ga. Feb. 16, 2017) (citations omitted) (noting that "only decisions of the United States Supreme Court and the Eleventh Circuit are binding on this Court" and distinguishing <u>Craighead</u>); <u>United States v. Aldissi</u>, No. 8:14-cr-217-T-33EAJ, 2014 WL 8239387, at *8 (M.D. Fla. Dec. 23, 2014), adopted at *1 (finding "facts of this case [were] clearly distinguishable from those in *Craighead*").

2.    *Voluntariness*

Kight also moves to suppress his statements on the ground that they were not voluntary.  [Doc. 21 at 15-17].  Specifically, he asserts that SA Fowler coerced and threatened him to make statements by telling him that "his parole conditions required him to cooperate with law enforcement investigations."  [Doc. 35 at 26].  Kight also argues that SA Fowler threatened him by reminding him that his conditions of parole prohibited him from using electronic messaging services and commenting that he had already seen evidence that Kight violated this condition.  [Id.].  The government responds that there was no official coercion on the part of the agents in this case, and the totality of the circumstances surrounding the interview indicate that Kight's statements were made voluntarily.  [Doc. 40 at 19-20].

Although Kight's statements were not taken in violation of Miranda, "the court still must determine that any confessions or incriminatory statements made by [Kight] were voluntary in order to admit them at trial."  United States v. Lazarus, 552 F. App'x 892, 895 (11th Cir. 2014) (per curiam) (unpublished) (citing United States v. Bernal–Benitez, 594 F.3d 1303, 1317–18 (11th Cir. 2010)).  Whether a statement was voluntarily given must be examined in light of the totality of the circumstances.   United States v. Shepherd, Criminal Case No. 1:11–cr–00058–ODE–RGV–1, 2011 WL 4443440, at *7 (N.D. Ga. Aug. 23, 2011),

adopted by 2011 WL 4443435, at *1 (N.D. Ga. Sept. 21, 2011) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); Hubbard v. Haley, 317 F.3d 1245, 1252 (11th Cir. 2003)).  "This totality of the circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of 'an essentially free and unconstrained choice.'" United States v. Villaverde-Leyva, Criminal Action File No. 1:10-CR-035-RWS/AJB, 2010 WL 5579825, at *11 (N.D. Ga. Dec. 9, 2010), adopted by 2011 WL 121932, at *1 (N.D. Ga. Jan. 14, 2011) (citation omitted).  "Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." Id. (citations omitted).

The focus of the voluntariness inquiry is whether the defendant was coerced by the government into making the statement, so "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421 (1986); see also United States v. Cordova, 829 F. Supp. 2d 1342, 1353 (N.D. Ga. 2011), adopted at 1345 (citation omitted).  Thus, "[t]hose cases where courts have found confessions to be involuntary 'have contained a substantial element of coercive police conduct.'" United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *4 (N.D. Ga. Aug. 10, 2007), adopted at *1

(quoting Colorado v. Connelly, 479 U.S. 157, 164 (1986)).  "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession."  United States v. Jones, 32 F.3d 1512, 1517 (11th Cir. 1994) (per curiam) (citation and internal marks omitted); see also Martin v. Wainwright, 770 F.2d 918, 926 (11th Cir. 1985), modified in unrelated part by, 781 F.2d 185 (11th Cir. 1986) (per curiam) (alteration in original) (citation and internal marks omitted) (noting that the test for determining voluntariness of a confession and whether coercion was present is whether the defendant's "will [was] overborne and his capacity for self-determination critically impaired").

Kight contends that SA Fowler coerced him to make statements on April 17, 2018, by telling him that the conditions of his parole required him to cooperate with law enforcement and mentioning that his parole officer was at the residence, even though he was not participating in the interview.  [Doc. 35 at 26].  Acknowledging that cooperation with law enforcement investigations may not have been an actual condition of his parole, Kight argues that SA Fowler's tactics "were either intended as a threat or a misrepresentation at best and a lie at worst," and "[i]n any event, his tactics were coercive."  [Id.].  Kight also asserts that he felt threatened, and told the agents so, when SA Fowler reminded him that he was prohibited from using

electronic messaging services because SA Fowler said that he had already seen evidence that Kight had done so, which was a violation of his parole.  [Id.].

Near the beginning of the recorded interview, SA Fowler acknowledged that Kight was on parole, but he sought to make it clear to Kight that he would not face parole consequences if he decided not to speak with the FBI by reading to him a prepared statement.  (Tr. at 24-25; Gov't Ex. 4 at 6).  In particular, SA Fowler told Kight:

> This is a voluntary interview. Accordingly, you do not have to answer any questions. It is not a violation of your parole to refuse to answer my questions or to refuse to speak with me. If you do not wish to answer any questions, your refusal to answer my  questions will not, in and of itself, subject you to any proceedings or adverse actions against you related to your parole. Any requirement of your parole that would ordinarily require you to cooperate and answer my questions or face penalties does not apply for the purpose of this interview. Any statements you provide can be used against you in criminal or other proceedings. You are free to terminate this interview at any time. Do you  understand what I said?

(Gov't Ex. 4 at 4-7).  Kight indicated that he understood the statement that SA Fowler read, did not have any questions about it and wanted to talk to the agents. (Id. at 7).

Kight cites Garrity v. New Jersey, 385 U.S. 493 (1967), and Boyd v. United States, 116 U.S. 616 (1886), overruled on other grounds, Warden, Md. Penitentiary v. Hayden, 387 U.S. 294 (1967), as examples of situations similar to the circumstance

he confronted where statements were found to be coerced because individuals faced "the impossible dilemma of either giving a statement or suffering untold consequences in the context of employment and forfeiture." [Doc. 35 at 28]. In Garrity, the Supreme Court ruled that statements made by police officers during an internal investigation were not voluntary where they were told that they did not have to answer questions that would tend to incriminate them, but if they refused to answer, they would be subject to termination because "[t]he option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent." 385 U.S. at 497. Similarly, in Boyd, the Supreme Court held that a statute in a civil forfeiture action offering the owner an election between producing a document or forfeiture of the goods at issue was a form of compulsion. 116 U.S. at 621-22. However, as the government points out, Kight did not face a similar dilemma here "since SA Fowler alleviated any concern regarding the parole conditions by advising [Kight] that he would not face parole consequences if he chose to remain silent and not participate in an interview with the FBI." [Doc. 40 at 19 (citation omitted)]; see also (Gov't Ex. 4 at 5-7). The recorded interview demonstrates that Kight understood that the interview was voluntary, that it would not be a violation of his parole to refuse to answer questions or refuse to speak to the FBI agents, and that he was free to terminate the interview at any time.

See (Gov't Exs. 3 & 4).  Thus, he did not face the dilemma presented in Garrity and Boyd, and his statements were not involuntarily made on this basis.

Kight next argues that his statements were involuntary because SA Fowler misrepresented to him that the conditions of his parole required him to cooperate with law enforcement investigations.  [Doc. 35 at 30-32].  Kight likens the alleged misrepresentation about his parole conditions to the circumstances in Lynumm v. Illinois, 372 U.S. 528 (1963), and Rogers v. Richmond, 365 U.S. 534 (1961), where the Supreme Court ruled that deceptive statements by law enforcement rendered confessions involuntary.  [Id.].  However, Kight's argument is without merit because SA Fowler did not tell him that he was required to cooperate with law enforcement investigations as a condition of his parole.  Instead, SA Fowler said to him "understanding conditions of your parole is *potentially* to have to talk to law enforcement or whatever," (Gov't Ex. 4 at 5 (emphasis added)), "we really want you to know that this is voluntary," (id.), and went on to say that "[a]ny requirement of your parole that would ordinarily require you to cooperate and answer my questions or face penalties does not apply for the purpose of this interview," (id. at 7).  SA Folwer also explicitly told Kight that it was "a voluntary interview," (id. at 6), and that he did "not have to answer any questions," (id.), and that its was "not a violation of [his] parole to refuse to answer [SA Fowler's] questions or to refuse to speak with

40

[him]," (id. at 7).  Kight responded that he understood SA Fowler's statements and wanted to speak to him about the investigation.  (Id.).  Thus, there was no misrepresentation  made by law enforcement in this case to coerce Kight, and certainly nothing comparable to the circumstances in Lynumm and Rogers that rendered his statement involuntary.

Finally, Kight complains that the presence of his parole officer at the residence during the search and SA Fowler's comment about seeing evidence that Kight had used electronic messaging services in violation of his parole was so highly coercive and threatening as to render his statements involuntary.  [Doc. 35 at 7-8, 26, 33].  SA Fowler addressed the presence of the parole officer at the residence at the outset of the interview, stating, "I know your parole officer was downstairs," (Gov't Ex. 4 at 6), but  added that he was not participating in the interview, (id.), and specifically stated that the interview was "separate from [Kight's] parole issues," (id. at 4).  In connection with these comments, SA Fowler also read the statement previously discussed, advising Kight that, if he did "not wish to answer any questions, [his] refusal to answer [SA Fowler's] questions [would] not, in and of itself, subject [him] to any proceedings or adverse actions against [him] related to [his] parole."  (Id. at 6-7).  Understanding the statement SA Fowler read to him, Kight agreed to talk to the agents, with the awareness that he was "free to terminate this interview at any

time." (Id. at 7).  Thus, the mere presence of his parole officer at the residence was

not so coercive as to render his statements involuntary.  See United States v. Gaines,

89 F. Supp. 2d 419, 423 (W.D.N.Y. 2000), adopted at 419 (refusing "to find that the

presence of parole officers, in and of itself, was sufficient to make the police activity

coercive").

SA Fowler's comment about Kight's use of electronic messaging services

occurred over half way through the interview as SA Fowler was confronting Kight

about his candor, and the following exchange occurred:

> [SA] FOWLER: We - - we hope everybody's honest with us and we
> know everybody has a different thing.
>
> [] KIGHT: Right.  *[Dog whining.]*
>
> [SA] FOWLER: So that's okay.  Shh, doggy.  I'm here for a reason and
> I know that you want to know about that and I kind of hinted at it.
> And ultimately I think you made a poor choice and I'm gonna get to
> that.
>
> [] KIGHT: Okay.
>
> [SA] FOWLER: We're talking about a company that had their systems
> hacked.
>
> [] KIGHT: Uh-huh *[affirmative]*.
>
> [SA] FOWLER: And we were able to track that user to this house using
> the Linux machine.  And we know that and the company that was
> hacked, some important data was stolen. Source code. You know what
> source code is.
>
> [] KIGHT: I do, yes.

[SA] FOWLER: Right.  And then that data was - - communication with that company happened over e-mail.

[] KIGHT: Okay.

[SA] FOWLER:  And the person was trying to basically get a certain amount of ransom for their time.

[] KIGHT: Okay.

[SA] FOWLER: For example.  So and the - - the way that we got here - -

[] KIGHT: Uh-huh *[affirmative]*.

[SA] FOWLER: - - first of all, to this house, and how everything has lead us here, I think obviously there's a pretty compelling case because we convinced a judge - -

[] KIGHT: Right.

[SA] FOWLER: - - to let us in the house and search things and go through your computers and you have a lot of things open.

[] KIGHT: Like I said, I don't encrypt - -

[SA] FOWLER: You do.

[] KIGHT:  - - anything, and don't try to hide anything.

[SA] FOWLER: You do and there's  - - I already see messaging platforms being used for various things.

[] KIGHT: Well, that's - - you didn't ask me about - -

[SA] FOWLER: No, I know.  I know.

[] KIGHT: I would have told you that.

[SA] FOWLER: I didn't say - - but I know that's a term of your parole, too.  Which is a separate issue.  I know we're talking about separate things.  I'm not worried about that.

[] KIGHT: Wait, wait.  I mean I'm - - some of the messaging things I am allowed to use.

[SA] FOWLER: Oh, okay.  I don't care about the parole thing.

[] KIGHT: Right.

[SA] FOWLER: I didn't mean - - I shouldn't even have said anything because I'm not worried about that necessarily.

(Gov't Ex. 4 at 69-71).  Kight subsequently said that he felt "a little bit" threatened by SA Fowler's comment about the use of messaging boards being a parole violation, but added that he felt that they got off on the wrong foot due to a joke Kight made about the recorder.  (Id. at 77).  SA Fowler assured him that he was not offended, nor "worried about that at all."  (Id.).  Kight later commented that "the message board thing was what got [him] a little worried," (id. at 78), and SA Fowler responded, "Well, I think you have other things to be worried about," (id. at 79).  The interview continued on for several more minutes with Kight continuing to deny any knowledge of the crimes under investigation.

Having listened to the audio recording of the interview and considered Kight's answers to the questions posed during the interview and his interaction with the agents, the Court is not persuaded that the brief exchange about the use of message boards being a violation of Kight's parole in the middle of a two-hour

interview was so coercive as to render his statements involuntary under the totality of the circumstances.  The audio recording reveals that the agents and Kight conversed in a normal, conversational tone throughout the interview, even when the agents confronted him about his candor.  <u>See</u> (Gov't Ex. 3).  The agents ensured that Kight was comfortable at the outset of the interview, provided him restroom breaks and water to drink, interacted with his dog and engaged in casual conversation with him during breaks in the questioning, both before and after the comment about his use of message boards being a violation on his parole.  (<u>Id.</u>; Tr. at 20-21).  There is no discernable difference in Kight's demeanor during the interview after SA Fowler mentioned his use of message boards beyond Kight's comments that he felt threatened "a little bit" by the comment, and SA Fowler readily said he should not have mentioned the topic and moved on from it.  (Gov't Exs. 3 & 4).  Kight continued to talk with the agents for approximately 45 minutes after this exchange, and there was no indication that his will was overborne by the comment as he continued to deny any knowledge of or participation in the crimes under investigation, just as he had before the exchange.  <u>See</u> <u>United States v. Herron</u>, No. 2:14-cr-23-FtM-38DNF, 2015 WL 867309, at *6 (M.D. Fla. Feb. 4, 2015) (citation omitted) (finding that officer's statement that defendant alleged was "a promise of leniency" was not enough "to overcome [defendant's] will later" since defendant "continued to deny that he [committed the crimes for which he was accused]" after

the officer's statement); see also United States v. Hailey, CRIMINAL CASE NO. 1:15-CR-00332-ELR-LTW, 2016 WL 11440138, at *7 (N.D. Ga. Oct. 24, 2016), adopted by 2016 WL 7131516, at *1 (N.D. Ga. Dec. 6, 2016) (finding defendant's "self-serving statement" that she felt threatened during the interviews did "not comport with her demeanor and actions at the time of the . . . interviews). Accordingly, it is **RECOMMENDED** that Kight's motion to suppress his statements, [Doc. 21], be **DENIED**.

## III.  CONCLUSION

For the foregoing reasons and cited authority, it is **RECOMMENDED** that Kight's motion to suppress evidence resulting from execution of search warrants, [Doc. 20], and motion to suppress statements made to law enforcement, [Doc. 21], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 11th day of March, 2019.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE